Filed 8/18/23  In re D.L. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re D.L., a Person Coming Under the Juvenile Court Law. | B321015 (Los Angeles County Super. Ct. No. MJ24058) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>D.L., a Minor,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Brian C. Yep, Judge.  Affirmed.

Lynette Gladd Moore; Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Heidi Salerno, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Appellant D.L., who was born in 2001, appeals from orders sustaining a juvenile wardship petition and the court's disposition order. Appellant admits that he and Deonta Johnson also known as "Fatboy" "planned to rob a neighborhood convenience store called 'the [D]airy.'" Appellant also admits that Johnson would "rush in with a gun belonging to appellant and demand the money." It is undisputed that Johnson shot the Dairy's employee, John Ruh, three times and Ruh died of multiple gunshot wounds.

Appellant does not challenge on appeal that he was a major participant in the robbery. He, however, challenges the sufficiency of the evidence to support that he participated in the robbery with reckless indifference to human life. We conclude substantial evidence shows appellant acted with reckless indifference to human life and affirm the order sustaining the Welfare and Institutions Code section 602 petition and the dispositional order.

## BACKGROUND

As a preliminary matter, we note that in his appellate briefing, appellant concedes he "provided the gun and induced Ruh to open the cash register" and expressly assumes there was sufficient evidence to support he was a major participant in the robbery. We agree with appellant's assumption that he was a major participant in the underlying felony. As is evident from our factual summary below, appellant participated in every

2

phase of the robbery.  He planned the robbery, induced Ruh to open the cash register, supplied the lethal weapon used in the robbery, and was present during the robbery.  As his confederate used lethal force, appellant watched and smiled.  Appellant's participation in the robbery "was sufficiently significant to be considered 'major.' " (*People v. Clark* (2016) 63 Cal.4th 522, 611 (*Clark*).)

Our factual summary is accordingly focused on appellant's only appellate challenge, that is, to the sufficiency of the evidence regarding reckless indifference to human life.

## 1.    *Welfare and Institutions Code section 602 petition*

As later sustained, the second amended petition in count one alleged appellant committed Ruh's murder.  The murder occurred while appellant and Johnson were attempting to commit a robbery.  A principal was armed with a firearm.

In count two, the People alleged, and the court sustained, one count of attempted second degree robbery and that a principal was armed with a firearm.[1]

## 2.    *Evidence at trial*

The parties stipulated in the 2022 trial that Ruh died of multiple gunshot wounds.  Appellant did not call any witnesses.

### a.    **M.H.'s testimony**

M.H. dated appellant and M.H.'s daughter referred to appellant as dad.  Appellant told M.H. that Fatboy proposed robbing the Dairy.  According to M.H., Fatboy was a member of

---

[1] Additional allegations, including three counts of dissuading a witness, M.H., by force or threat, were dismissed.

the 30 Crip Harlem gang.  M.H. testified that appellant belonged to a different gang.

Appellant told M.H. that he and Fatboy planned a robbery. They knew that Ruh worked alone.  Appellant said he gave the gun to Fatboy "right before" entering the Dairy.  Appellant told M.H. that Fatboy was supposed to scare Ruh with the gun.

Appellant also told M.H. the robbery did not "go as planned" because Fatboy shot the cashier and that "was not supposed to happen."  Appellant said, "Fatboy had shot him [Ruh] just for no reason."  Appellant reiterated to M.H.:  "They was just supposed to rob him and that was it."  Appellant told M.H., "Fatboy had told the man to put his hands up" and appellant was near the door "telling him [Fatboy] to come on, and that's when Fatboy had shot the man."

After the shooting, appellant and Fatboy went to appellant's house where Fatboy had been staying.  Appellant told M.H. the gun was "dirty" because Fatboy shot the cashier. Neither appellant nor Fatboy obtained any money from the robbery.

Appellant told M.H. not to tell anyone about the attempted robbery and shooting, and also told M.H., " 'I got to get out of here.' "  After the shooting, M.H. saw appellant carry the gun to the "places we go" such as clubs.  Appellant described the gun as " 'dirty' " and said, " '[I]t's got a body on it.' "

### b.    Security footage

Detective Steven Blagg described the video footage of the robbery.[2]  "Mr. Ruh just accepted something from somebody

_____

[2] This video footage is not in the appellate record.

[appellant] on the other side of the counter. When he opened the register another figure appeared [Johnson] . . . causing Mr. Ruh to slam the door shut of the cash register. What appears to be gunshots go off. And the person who was on the customer side of the counter [appellant], . . . then starts to walk towards the door while smiling."

Another video showed appellant asking Ruh, " 'Can I get a Newport [cigarette]?' " Appellant hands something to Ruh causing Ruh to open the cash register. After Ruh opens the cash register, Johnson says, " 'Empty the register.' " Ruh slammed the cash register shut. Ruh said, " 'What are you gonna rob me with a pellet gun?' " Ruh opened the cash register because appellant paid for the Newport cigarette. Appellant did not object to the latter statement.

Detective Blagg further testified that videos of the incident showed Johnson firing the gun. He said that three shots can be heard on the video. According to Blagg, "[T]here was a lull between the first and second gunshot." According to Blagg, each time Johnson fired, appellant's body twitched; Detective Blagg explained that twitching is a typical response to a gunshot in close proximity. Blagg further described that as the shots were being fired, appellant was "[v]ery slowly moving" towards the door. Appellant "continued to observe what was going on behind the counter." After the shooting, Johnson continued to try to break open the cash register and appellant left the Dairy.

From the video it appeared to Blagg that appellant was about 15 yards ahead of Johnson as both traveled in the same direction away from the Dairy.

### c. Other evidence

Detective Scott Lawler testified that he interviewed appellant. Appellant said he lived with Fatboy but when Fatboy stole from appellant's sister, appellant's mother told Fatboy to leave the home.

When Lawler interviewed appellant, appellant said he went alone to the Dairy to get a cigarette. Appellant said that he "frequently" went to the Dairy.

Appellant stated that "[w]hile inside getting the cigarette somebody came in with a gun. He [appellant] ran, or attempted to run out but that individual was blocking the door. He finally made it outside and heard . . . two to three gunshots as he was running away."

After Detective Lawler informed appellant that video surveillance depicted appellant and Johson approaching the Dairy, appellant then changed his story stating: "[O]n the morning of the incident Deonta [Johnson] approached him . . . . [Johnson] stated 'Let's go get a cigarette.' That's when both of them left [appellant's] house to go get a cigarette. Appellant said that Johnson robbed the store. Appellant said that Johnson shot Ruh. Appellant "saw" Johnson shoot Ruh with a black and chrome semi-automatic firearm. Appellant said he did not call the police. Appellant told Lawler he knew Ruh.

### 3. *Court findings and sentence*

The trial court found the following facts: Deonta Johnson and appellant arrived at the Dairy around the same time. Appellant entered the Dairy and asked Ruh to buy a cigarette. "[T]his is part of a plan. . . . so that the victim will open the cash drawer. And as soon as the victim opened the cash drawer

6

Deonta Johnson rushed in from the side, gun drawn, and asked the victim for money. The victim shuts the cash drawer and refuses to give the money to Deonta Johnson. There's a brief verbal exchange. And then Deonta Johnson shoots the victim three times."

The court continued: Appellant does not call "emergency medical services, does not try to assist the victim, he does not call 911 for the sheriff's [*sic*] to come." Johnson unsuccessfully tries to open the cash drawer and then Johnson and appellant run "across the same open field, in the direction of the minor's house."

The court found, "[T]here was clearly a plan . . . [a]nd the gun had to be part of the plan, otherwise the robbery would not be successful." As soon as Ruh opened the cash drawer, "Johnson rushed in from the side of the victim with the gun drawn. So clearly, the gun was part of the plan that was hatched to rob the Dairy."

The court further found, "The undisputed evidence is that the minor chose the Dairy for the robbery. The minor had been there many times before and he knew the victim. Clearly, the victim must also have known or known of the minor. With this in mind, how could the robbery have been successful unless the victim was shot and killed? In other words, how could Deonta Johnson and the minor have gotten away with the robbery if, in fact, the victim knew who they were or at least knew who the minor was."

The court found that appellant was a major participant in the robbery who acted with reckless indifference to human life. The court then sustained the petition.

After a contested disposition hearing, the court sentenced defendant to a secure youth treatment facility for a period of 25 years to life.

## DISCUSSION

### A.    Standard of Review

Appellant's sole challenge is to the sufficiency of evidence that he acted with reckless indifference to human life and that he had intent to kill.[3]  "[W]e determine whether substantial evidence—'evidence that is reasonable, credible, and of solid value'—supports the juvenile court's findings.  [Citation.]  We view the evidence 'in the light most favorable to the prosecution and presume in support of the [findings] the existence of every fact the [court] could reasonably have deduced from the evidence.'  [Citation.]  We 'accept [all] logical inferences that the [court] might have drawn from the . . . evidence' [citation], but reject inferences ' "based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work" ' [citation]."  (*In re I.A.* (2020) 48 Cal.App.5th 767, 778.)

---

[3] Because appellant does not challenge the sufficiency of the evidence supporting that he was a major participant in the robbery and we conclude that there was substantial evidence supporting he acted with reckless indifference to human life sufficient to support the murder conviction, we need not consider whether he also harbored the intent to kill Ruh.

**B.     Standard for Reckless Indifference to Human Life**

Senate Bill No. 1437 amended Penal Code[4] section 189 to provide that a defendant who was not the actual killer or did not have an intent to kill is not liable for felony murder unless he "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); Stats. 2018, ch. 1015, § 3; *People v. Strong* (2022) 13 Cal.5th 698, 703.)  Section 190.2, subdivision (d) provides:  "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony [including robbery] . . . which results in the death of some person or persons, and who is found guilty of murder in the first degree . . . shall be punished by death or imprisonment in the state prison for life without the possibility of parole . . . ." (§ 190.2, subd. (d).)  The newly narrowed scope of felony murder is based on "preexisting law governing felony-murder special-circumstance findings . . . to determine whether the defendant may be sentenced to death or life without possibility of parole." (*Strong*, at p. 703.)

Section 190.2 codified the rule announced in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).  (*People v. Clark, supra*, 63 Cal.4th at p.616.)  Both *Tison* and a prior United States Supreme Court case, *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*), permit imposition of the death penalty for a felony murder when a defendant's involvement is substantial and demonstrates a reckless indifference to the risk of death.  The two cases "help define the constitutional limits for punishing

_____

[4] Undesignated statutory citations are to the Penal Code.

9

accomplices to felony murder." (*In re Loza* (2017) 10 Cal.App.5th 38, 46.) "At one end of this *Enmund-Tison* continuum is ' "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." [Citation.]' [Citation.] At the other end are the 'actual killers and those who attempted or intended to kill. [Citation.]' [Citation.] 'Somewhere between them . . . lies the constitutional minimum' showing required for the imposition of death or life without the possibility of parole." (*Ibid*.) That constitutional minimum is the standard now incorporated into the definition of felony murder. (§ 189.)

  *Enmund, supra*, 458 U.S. 782 involved a robbery and murder of an elderly couple. (*Id*. at p. 784.) Enmund drove two confederates to the scene and waited to help them escape. (*Id*. at pp. 786, 788.) He was not present for the murder or robbery. (*Id*. at p. 788.) The Supreme Court held that imposition of the death penalty was inconsistent with the Eighth and Fourteenth Amendments when *Enmund* did not kill the victims, was not present when they were killed, and did not intend they be killed or anticipate that lethal force would or might be used. (*Ibid*.)

  The facts of *Tison* demonstrated a more culpable mental state than that harbored by the defendant in *Enmund*. In *Tison*, in an effort to help Gary Tison escape prison, the Tison family, including sons Raymond and Ricky, "assembled a large arsenal of weapons." (*Tison, supra*, 481 U.S. at p. 139.) Family members entered the prison carrying an ice chest filled with guns. (*Ibid*.) They armed Gary Tison and his cellmate and left the prison. (*Ibid*.) Gary Tison and his cellmate "brutally murder[ed]" four "captives" who had stopped to try to aid the Tison family with a flat tire. (*Id*. at p. 141.) "Neither [Raymond nor Ricky] made an

10

effort to help the victims, though both later stated they were surprised by the shooting." (*Ibid*.) Raymond and Ricky were convicted of felony murder for all four murders. (*Ibid*.)

The United States Supreme Court upheld the death sentence, finding Raymond and Ricky showed reckless indifference to human life. (*Tison*, *supra*, 481 U.S. at p. 152.) The high court reasoned that Raymond Tison was prepared to kill in furtherance of the prison break, flagged down the victims to assist with the flat tire, robbed the victims and guarded them at gunpoint while the group considered their fate. Raymond "stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. (*Id*. at p. 151.) "Instead, he chose to assist the killers in their continuing criminal endeavors . . . ." (*Ibid*.) Similarly, Ricky Tison brought guns into the prison to arm the prisoners, participated in the kidnapping and robbery, and watched the killing without aiding the victims. (*Id*. at p. 152.)

Our high court applied *Enmund* and *Tison* in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*). Defendant Matthews "acted as the getaway driver for an armed robbery in which Leon Banks and others participated." (*Id*. at p. 794.) "In the course of escaping, Banks shot one of the robbery victims." (*Ibid*.) Matthews and two of his confederates were gang members, but Banks was not a gang member. (*Id*. at pp. 795–796, 810.) Although the gang's primary activities included shootings, attempted murders and murders, "[n]o evidence was presented that Matthews" or his fellow gang members "had killed before, or that Matthews knew any of the three had killed before." (*Id*. at p. 796.)

11

Our Supreme Court reversed the felony murder special circumstance, finding Matthews no more culpable than the getaway driver in *Enmund*. (*Banks*, *supra*, 61 Cal.4th at p. 794.) Our Supreme Court emphasized that "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder such as Earl Enmund." (*Id*. at p. 802.) "Matthews, like Enmund and unlike the Tisons, did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop the shooting or render assistance." (*Id*. at p. 807.) Although Matthews knew he was participating in an armed robbery, "nothing at trial supported the conclusion beyond a reasonable doubt that Matthews knew his own actions would involve a grave risk of death. There was no evidence Matthews intended to kill or, unlike the Tisons, knowingly conspired with accomplices known to have killed before. Instead, as in *Enmund*, Banks's killing of [the victim] was apparently a spontaneous response to armed resistance from the victim." (*Ibid*.)

Subsequent to *Enmund* and *Tison*, courts have refined the meaning of reckless indifference to human life. " '[T]he culpable mental state of "reckless indifference to life" is one in which the defendant "knowingly engag[es] in criminal activities known to carry a grave risk of death" [citation] . . . .' [Citation.]" (*In re Bennett* (2018) 26 Cal.App. 5th 1002, 1021.)

The following nonexclusive factors are relevant to whether defendant acted with reckless indifference to human life: (1) the defendant's knowledge of weapons and use of a weapon even if the defendant did not kill the victim; (2) the defendant's presence at the scene of the crime and failure to aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of a cohort's

likelihood of killing; and (5) the defendant's efforts to minimize risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.) No single factor is " 'necessary' " or " 'necessarily sufficient.' " (*In re Bennett*, *supra*, 26 Cal.App.5th at p. 1019.)

Our high court explained in *Clark* that the mental state comprising reckless indifference "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his [or her] actions." (*Clark*, *supra*, 63 Cal.4th at pp. 616–617.) The required intent has "both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by . . . what 'a law-abiding person would observe in the actor's situation.' [Citation.]" (*Id*. at p. 617.)

In *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), our high court held that a petitioner who planned an unarmed assault and was not present when a confederate shot the victim did not act with reckless indifference to human life. (*Id*. at pp. 671, 672, 678–679.) *Scoggins* further held that " '[a]wareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' " to establish reckless indifference to human life; " 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement. [Citation.] Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Id*. at p. 677.)

## C.   Substantial Evidence Supports the Conclusion That Appellant Acted with Reckless Indifference to Human Life

Applying *Clark*'s factors (which *Scoggins* reaffirmed) here, we conclude that substantial evidence supports the trial court's order.  (See *Scoggins, supra,* 9 Cal.5th at p. 677.)  In so concluding, we consider the totality of the circumstances.  (*Ibid.*)

### 1.   *Defendant's knowledge of weapons and use of a weapon*

Appellant did not personally use a weapon.  Appellant knew a weapon would be used in the robbery and in fact, provided the weapon to his confederate.  Appellant acknowledges that he "provided the murder weapon . . . ."  M.H. testified that appellant told her he gave Fatboy the gun so that Fatboy could scare Ruh.

### 2.   *Defendant's presence and failure to aid*

Appellant was present at the scene of the crime and did not aid the victim.  Appellant told law enforcement that he did not call the police.

### 3.   *Duration of the felony*

Our record does not disclose the duration of the felony, but it appears to have occurred over a short time period.  Appellant requested a cigarette; Johnson ordered Ruh to empty the cash register; Ruh refused; Johnson shot Ruh three times, Johnson tried to open the cash register; and both appellant and Johnson left the Dairy, traveling in the same direction.

14

Notwithstanding the short duration, the felony lasted long enough for appellant to have had an opportunity to intervene. There was a "lull" between the first and second shooting. Appellant did not try to stop Johnson from shooting again. Instead he merely observed with a smile on his face. (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1012, 1014 [even if felony was brief, petitioner had opportunity to "say or do something"].)

### 4.    *Likelihood of killing*

There was no evidence of appellant's knowledge of Johnson's likelihood of killing. Although Johnson was a gang member, there was no evidence that Johnson previously killed or attempted to kill anyone. We agree with appellant insofar as he argues that there was no evidence he and Johnson agreed to kill Ruh to avoid being identified by Ruh. However, no evidence supports appellant's alternate theory that Johnson's decision to shoot arose quickly was based on " '[Ruh's] unexpected resistance' " to opening the cash register. The evidence was that Ruh opened the cash register but then closed it, not that he resisted opening it. More important, the record does not show that Johnson's decision to shoot was based on " 'unexpected resistance' " because no witness supports that scenario.

### 5.    *Appellant's efforts to minimize risk of violence*

Appellant knew that Johnson would use the gun to scare Ruh. There was no evidence that appellant took any steps to decrease the risk of violence created by such a threat. To the contrary—he provided the loaded firearm to Ruh. This case is not like *Clark,* where the defendant planned a robbery at a store when it was closed and planned that the robbery

15

involve only one unloaded gun.  (*Clark, supra*, 63 Cal.4th at pp. 621–622.)

Considering the totality of the circumstances, appellant was not " ' "the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." [Citation.]' [Citation.]" (*In re Loza, supra*, 10 Cal.App.5th at p. 46.)  Except for the absence of any evidence concerning Johnson's proclivity to kill, all of the *Clark* factors support the trial court's finding that appellant acted with reckless indifference to human life.  Further, even if appellant did not know of a likelihood Johnson would shoot Ruh before the shooting, he was aware of the risk of death once the shooting started and did nothing to assist Ruh during the lull between the first and second shot.  Substantial evidence thus supports the trial court's conclusion that appellant harbored reckless indifference to human life.

Appellant's contrary argument does not view the evidence in the light most favorable to the trial court's order.  For example, appellant states that "[t]he crime happened quickly and [appellant] had no opportunity to restrain Johnson or aid the victim."

Appellant's similar statement that he had "no realistic opportunity to intervene before Johnson opened fire" is not supported by citation to the record.  Appellant's statements ignore the evidence that he was near Johnson and the victim during the shooting.  He chose not to attempt to restrain or even dissuade Johnson from shooting.  Instead, he smiled as Johnson shot Ruh.  According to Detective Blagg's description of the video footage, appellant "just stands there observing the interaction between Deonta Johnson and Mr. Ruh."  Appellant's statement

16

that he "left immediately when Johnson started shooting" also is incorrect. The evidence showed that appellant did not leave until after Johnson fired all three shots.

Appellant's reliance on *People v. Ramirez* (2021) 71 Cal.App.5th 970 is misplaced. In *Ramirez*, Division Seven of this court concluded that a petitioner seeking resentencing of a murder conviction did not act with reckless indifference to human life. (*Id*. at p. 975.) The court explained: "Ramirez did not provide the murder weapon, instruct his confederate to shoot, or know of his confederate's propensity toward violence, and the shooting occurred quickly without Ramirez having a meaningful opportunity to intervene." (*Ibid*.) In *Ramirez,* the 15-year-old petitioner "did not want a gun to be used and did not want to be involved" in a planned carjacking. (*Id*. at p. 979.) When his confederate started shooting during the carjacking, Ramirez " 'took off.' " (*Ibid*.) Additionally, Ramirez presented evidence that he "did not want to hurt anyone." (*Id*. at p. 981.) The shooter was on the driver side and Ramirez was on the passenger side of a vehicle during the shooting and Ramirez was not close enough to restrain the shooter. (*Id*. at p. 989.) The rapid pace of the crime also afforded Ramirez "no opportunity" to intervene. (*Ibid*.) Ramirez did not know the victim was wounded by the gunfire. (*Ibid*.) The court further found that there was evidence "Ramirez was influenced by peer pressure" and his age (15 years) "diminishes any inference he acted with reckless disregard for human life . . . ." (*Id*. at p. 990.) "The evidence is not sufficient to prove 15-year-old Ramirez was 'subjectively aware that his actions created a graver risk of death' than any other armed carjacking." (*Id*. at pp. 990–991.)

17

The difference between *Ramirez* and the appeal before us is patent.  Appellant supplied Johnson with a loaded firearm.  In contrast to *Ramirez*, who did not want involvement of a gun, appellant wanted Johnson to use a gun to scare Ruh.  Whereas Ramirez was on the other side of a vehicle, making it impossible for him to intervene during the shooting, appellant was near Johnson and Ruh, and did nothing to intervene.  Instead, he smiled as Johnson killed Ruh.  Appellant presented no evidence that he did not want to shoot anyone or that he was influenced to participate in the robbery by peer pressure.

In his reply brief, appellant relies heavily on *People v. Keel* (2022) 84 Cal.App.5th 546 (*Keel*), which is also distinguishable.  In *Keel*, 15-year-old Keel and an 18-year-old confederate robbed a victim and one of them shot and killed the victim when the victim resisted the robbery and tried to flee.  (*Id*. at p. 550.)  Both Keel and his confederate were armed.  (*Id*. at p. 552.)  Both were identified as the shooter by eyewitnesses, but the casings recovered at the scene matched Keel's confederate's gun.  (*Id*. at p. 553.)  Keel testified that he was " 'shocked and 'surprised' " when his confederate pulled out a gun.  (*Id*. at p. 554.)  Keel further testified that he was " 'shocked,' " " 'scared,' " and " 'surprised' " when his confederate fired the gun.  (*Ibid*.)  Keel testified that his gun was not loaded and that he did not know his confederate's gun was loaded.  (*Id*. at pp. 553–554.)

The appellate court concluded that Keel did not act with reckless indifference to human life because Keel did not provide his confederate with the firearm or instruct the confederate to use the firearm.  (*Keel*, *supra*, 84 Cal.App.5th at p. 559.)  No evidence contradicted Keel's testimony that Keel did not know his confederate's gun was loaded.  (*Ibid*.)  Additionally, there was no

18

evidence that Keel's gun was loaded.  (*Ibid*.)  The appellate court indicated that the decision to rob " 'was made quickly' " and the "decision to shoot was apparently made even more quickly in response to [the victim's] unexpected resistance and efforts to flee."  (*Id*. at p. 560.)  Keel therefore had no "meaningful opportunity to restrain [his confederate]" or intervene to stop him.  (*Ibid*.)  Instead, the shooting was an " 'impulsive' response to the victim's unexpected resistance, as opposed to the culmination of a prolonged interaction that increased the opportunity for violence.'  [Citations.]"  (*Id*. at p. 561.)  Keel offered testimony that his confederate did not have a "reputation as a menace or a killer."  (*Ibid*.)

The court also relied on Keel's " 'youth at the time' " finding it " 'greatly diminishes any inference he acted with reckless disregard for human life' during the armed robbery."  (*Keel*, *supra*, 84 Cal.App.5th at p. 562.)  To that point, the court explained:  "[T]here was evidence suggesting Keel's youth may have rendered him especially vulnerable to outside pressures. Keel associated with the East Side Crips street gang when he was just six or seven years old.  He received a moniker . . . at the tender age of six from a gang member that, in Keel's words, he considered to be a 'father figure.'  According to Keel, there was an expectation among gang members that younger gang associates would 'instantly go do' their bidding.  Given this expectation, it is reasonable to infer Keel would have felt pressure to 'hit the block' and go along with the robbery instigated by . . . a fellow gang associate who was three years Keel's senior."  (*Ibid*.)

In contrast to *Keel*, the crime here was not "unplanned." Appellant and Johnson planned the robbery and selected the Dairy because Ruh worked alone.  In contrast to *Keel*, there was

19

no evidence appellant knew the gun was unloaded. To the contrary, he supplied the loaded weapon to his confederate. There was no evidence that appellant felt peer pressure to participate in the robbery or that appellant was especially vulnerable to peer pressure. No evidence in this case requires the conclusion that the shooting was an "impulsive response" in contrast to *Keel*.

Finally, both *Ramirez* and *Keel* considered the age of the defendant when evaluating whether he acted with reckless indifference to human life. In contrast to this case, in both *Ramirez* and *Keel* the defendants presented evidence showing the relevance of their youth to assessing their mental state. Here, no witness presented evidence that appellant's age (16) prevented him from harboring reckless indifference to human life. In his reply brief, appellant cites general principles indicating that juveniles are less mature than adults. The only support for applying this proposition to appellant is the unvarnished statement that "[t]here can be no reasonable doubt that at age 16 [appellant] was neurologically immature and because of that immaturity, like other adolescents of his age, he was prone to take more risks and make poorer choices than an adult with a f[u]lly developed prefrontal cortex."

Appellant's argument that he was "neurologically immature" has no evidentiary support in the record other than appellate counsel's mere argument. Although appellant's age is a "relevant factor" (*In re Moore* (2021) 68 Cal.App.5th 434, 454), it is not dispositive (*In re Harper* (2022) 76 Cal.App.5th 450, 470). Appellant cites no case supporting the proposition that a 16-year-old never can harbor reckless indifference to human life. The totality of circumstances supports the court's finding that

appellant acted with reckless indifference to human life when he planned a robbery, supplied the loaded firearm used in the robbery, smiled rather than intervened when his confederate shot the victim three times, and left the scene without any effort to assist the victim.

## DISPOSITION

The court's order sustaining the petition and the court's disposition order are affirmed.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.